UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

MARIANN KOPER,                                      Case No. DT 09-00846
                                                    Chapter 7
            Debtor.                                 Hon. Scott W. Dales
_____/

DONNA G. ASHER,                                     Adversary Pro. No. 09-80214

            Plaintiff,

v.

MARIANN KOPER,

            Defendant.
_____/

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW AFTER TRIAL**

PRESENT:   HONORABLE SCOTT W. DALES
           United States Bankruptcy Judge

Donna G. Asher (the "Plaintiff") filed a complaint in this court against Mariann Koper
(the "Defendant") to obtain a judgment excepting her claim from discharge.  Although the
Plaintiff originally sought relief under 11 U.S.C. § 523(a)(2) and (a)(4), she has since limited her
statutory basis for relief to 11 U.S.C. § 523(a)(4), contending that the debt, memorialized in a
state court consent judgment, arose from the Defendant's embezzlement of insurance proceeds.

This opinion expresses the court's findings of fact and conclusions of law following a
bench trial held on October 7, 2010 in Grand Rapids, Michigan.  As explained below, the court

will enter judgment for the Plaintiff excepting the Defendant's debt from discharge under 11 U.S.C. § 523(a)(4).

## I.  JURISDICTION

The court has jurisdiction over the Defendant's bankruptcy case pursuant to 28 U.S.C. § 1334(a), and this adversary proceeding falls within the court's "core jurisdiction" because it involves the dischargeability of a particular debt.  28 U.S.C. § 157(b)(2)(I).  The court has authority to enter final judgment.

## II.  FACTS

The Plaintiff and the Defendant were each married to the late George Asher, Sr., albeit at different times.  The Plaintiff was Mr. Asher's second wife, until they divorced in 1997.  The Defendant was Mr. Asher's third wife and, after his death in 2006, his widow.

Pursuant to a Consent Judgment of Divorce (Exh. 1, hereinafter "JOD"), Mr. Asher agreed, and the family court ordered, that the Plaintiff would remain as the "irrevocable beneficiary" of Mr. Asher's employment-related term life insurance policy in the amount of $91,291.00 ("Term Policy").  Several years later, in 2003, Mr. Asher procured from the same insurance company a supplemental policy (the "Supplemental Policy").

Unfortunately, neither Mr. Asher nor the Plaintiff provided Mr. Asher's employer, Chrysler Corporation ("Chrysler"), or the insurance company, Aetna Life Insurance Company ("Aetna"), with a qualified domestic relations order or "QDRO" directing them to pay the proceeds of the Term Policy to the Plaintiff upon Mr. Asher's death, in accordance with the JOD. In fact, when Mr. Asher died in March, 2006, both wives asserted claims with Aetna under Mr. Asher's insurance polices.  Aetna ultimately paid the Defendant, who received approximately $150,000.00 on account of the Term Policy and the Supplemental Policy.  From the bank records

and other documents admitted into evidence, the court finds that she received these funds in April, 2006.

According to the "Summary of File Regarding George Asher, Deceased," (*See* Exh. 9 to Trial Exh.11), which Defendant's former attorney prepared in contemplation of Mr. Asher's probate proceedings, the Defendant knew the Plaintiff was asserting a claim to the insurance proceeds at least by late September, 2006 because by that time the Plaintiff had served the Defendant with a deposition subpoena. In response to the subpoena, the Defendant sought counsel from Cadillac counsel, Roger L. Wotila, Esq.

From the testimony of the decedent's son, George Asher, Jr., and after drawing inferences from the Defendant's actions in the summer of 2006 described more fully below, the court finds that she knew of the Plaintiff's claim to the insurance proceeds even before receiving the probate court's deposition subpoena.

George Asher, Jr. described a scene that took place around the kitchen table in the Defendant's home in which he and his father discussed his father's desire to provide for both wives. According to the son's credible testimony, the father stated, in the Defendant's presence, that because the Plaintiff would be receiving life insurance proceeds, he felt compelled to deed his home to the Defendant to provide for her after his death. The Defendant testified that she was in and out of the room at that time, and did not overhear the conversation.[1] At another point in her testimony, however, she admitted she was tending to her ailing husband as he met with his son. She also said, later in her testimony, that her husband's concern about the insurance situation "was mentioned at the table," by which the court infers from testimonial context that she meant the kitchen table where and when her husband and his namesake were having the discussion. In fact, the Defendant, at her husband's direction, called a notary immediately after

---

[1] The Defendant and Mr. Asher lived in very close quarters, making it more likely she overheard the conversation.

the conversation to carry out her husband's wishes, at least insofar as he intended to transfer real estate to her. The court does not believe the Defendant was ignorant of her dying husband's reasons for the hastily-arranged real estate transaction.

The Defendant resented the fact that her husband asked to see the Plaintiff during his last days and that he sent her to the barn, with a key to a file cabinet where he kept important papers, to retrieve his will. Given the Defendant's admitted animus toward the Plaintiff, and Mr. Asher's dependence upon the Defendant during the last year he spent in hospice care, the court infers the Defendant knew more about Mr. Asher's testamentary arrangements than she revealed in her testimony.

Regardless, after learning of the Plaintiff's claim to the insurance proceeds, but before the Plaintiff filed suit against her, the Defendant expended or transferred more than $124,000.00 under circumstances carrying the traditional badges of fraud, usually associated with fraudulent conveyance jurisprudence. *See, e.g.,* M.C.L. § 566.34(2) (statutory codification of traditional badges of fraud).

On February 20, 2007, the Plaintiff sued the Defendant in state court, alleging Uniform Fraudulent Transfer Act violations.[2] Shortly after commencing that litigation, the Plaintiff and the Defendant agreed to a consent order enjoining the Defendant from transferring any insurance proceeds pending final judgment. The consent order, Exhibit 14, recited that $150,291.00 remained on deposit at an unspecified depository institution, suggesting inaccurately that the Defendant had not dissipated the funds at issue as of March 26, 2007.

On April 1, 2008, the Honorable John C. Foster of the Macomb County Circuit Court issued an Opinion and Order determining that the Defendant came into possession of certain insurance proceeds properly, due to the fact that Aetna was unaware of the Plaintiff's claim to

---

[2] In the same action, the Plaintiff also sued Chrysler and Aetna on different theories.

the policy because it had not received a QDRO following the JOD. *See* Exh. 15. Although Judge Foster found Aetna properly paid the Defendant on account of the Term Policy and the Supplemental Policy, the court nevertheless found that the Defendant held the proceeds of the Term Policy in "constructive trust" for the Plaintiff due to the Plaintiff's superior claim under the JOD.

The parties ultimately entered into a settlement which the state court incorporated into a Stipulated Final Order, dated May 23, 2008 (Exh.16). By signing the consent judgment, the Defendant agreed to pay the Plaintiff $79,000.00 in monthly installments after deducting the proceeds from the sale of her house and the unspent insurance proceeds. She also agreed to delay any bankruptcy filing by at least 90 days, in part so the property transfers required under the consent judgment would not be treated as preferences in the Defendant's potential bankruptcy case. The parties also bargained for default provisions pursuant to which judgment would enter against the Defendant for $91,251.00 under the Uniform Fraudulent Transfer Act. The Defendant is in default under the consent judgment.

The Defendant filed a Chapter 7 bankruptcy petition on January 29, 2009. The Plaintiff filed an adversary proceeding on May 10, 2009.

### III. ANALYSIS

As noted above, the Plaintiff relies on 11 U.S.C. § 523(a)(4), which provides in relevant part as follows:

> A discharge under section 727 . . .of this title does not discharge an individual debtor from any debt--
> . . .
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . .

11 U.S.C. § 523(a)(4). The United States Court of Appeals for the Sixth Circuit defines embezzlement for purposes of non-dischargeability litigation as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Id.,* 101 F.3d at 1173. A plaintiff seeking to except a debt from discharge must prove her case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991); *Attasi v. McLaren (In re McLaren)*, 990 F.2d 850, 853 (6th Cir. 1993).

The Defendant continues to contend that by entering into the Macomb County Circuit Court's consent judgment, the Plaintiff waived the right to except the underlying debt from discharge. The court rejected an earlier iteration of this argument in ruling on the Defendant's summary judgment motion, and adheres to that ruling. As before, the court relies primarily on the Supreme Court's decision in *Brown v. Felsen*, 442 U.S. 127, 138-39 (1979), and *Archer v. Warner*, 538 U.S. 314, 321 (2003) (*citing Brown*, 442 U.S. at 134). Under well-established law, the nature of the debt does not lose its underlying character simply because the parties settled and embodied the settlement in a consent judgment. "The mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt." *Archer*, 538 U.S. at 320-21 (*citing Brown*, 442 U.S. at 139).

Moreover, having heard the testimony of the parties and, especially, the testimony of the Plaintiff's state court counsel, Charlotte Allen, regarding the circumstances surrounding the consent judgment, the court finds as a matter of fact that the parties did not intend to resolve the dischargeable nature of the debt when they entered into the consent judgment simply by

mentioning the Defendant's possible bankruptcy.  Rather, by including in the consent judgment a reference to bankruptcy, the parties intended only to (1) exculpate the Defendant's daughters; and (2) address the possibility that the transfer of the Defendant's real estate in Manton, Michigan, and the $9,000.00 remaining from the Term Policy as part of the settlement, might be avoided as a preference.

Significantly, by signing the consent judgment, the Defendant admitted that the debt arose from her violation of the Uniform Fraudulent Transfer Act.  Although the Defendant's counsel argued that the underlying complaint alleged only constructive fraud (not supporting a finding of non-dischargeability),[3] the state court complaint, as amended, was not so limited. Moreover, the circumstances surrounding the various transfers impel the court to infer that they were not constructively fraudulent, but instead were transfers intended to put the property beyond the Plaintiff's reach -- circumstances indicating misappropriation with actual fraudulent intent.  Many of the traditional badges of fraud permit the court to draw this inference.

For example, courts endeavoring to discern fraudulent intent in similar settings may consider whether, after the transfer, the debtor retained possession or control of the property transferred.  Here, shortly after coming into possession of the insurance proceeds, the Defendant added her daughters to various bank accounts in which she had deposited the funds, in effect transferring an interest in the funds to them, yet retaining control as a joint account holder. Similarly, as noted below with respect to the real estate in Manton, Michigan, Defendant purchased the home and lived there, yet titled it solely in her daughter's name.

Having reviewed the preliminary injunction the parties negotiated in state court reciting that over $150,000.00 remained on deposit as of March 26, 2007, the court infers that the

---

[3] Non-dischargeability of a debt created by fraud requires fraud in fact, involving "moral turpitude or intentional wrong," which is not the same as fraud in law, which may exist without imputing "bad faith or immorality." *Compare Neal v. Clark*, 95 U.S. 704,706, 709 (1877) *with Forsyth v. Vehmeyer*, 177 U.S. 177, 182 (1900).

Page 8 of 11

Defendant concealed the pre-suit transfers from the Plaintiff, and perhaps from her own counsel, further indicating fraudulent intent. Similarly, the frequency with which she appears to have transferred funds between accounts, as Ms. Allen testified, made it difficult to follow the money trail -- additional circumstances indicating fraudulent intent.

The court notes, too, that the Defendant burned many of Mr. Asher's private papers very shortly after his death -- papers that he kept under lock and key in a file cabinet in the barn. Some of these papers evidently had some affect on the Plaintiff's rights either under the JOD or the will. Indeed, when Mr. Asher summoned the Plaintiff to his death bed and asked her to fetch his will, it put the Defendant into a state of pique that persisted through last week's trial.

During her testimony, the Defendant attempted to create the impression that she was simply protecting Mr. Asher's privacy and cleaning house when she burned the papers but, in her state court deposition, she admitted she burned the papers because she was "pretty well pissed" at the Plaintiff. She also admitted that she reviewed the documents and burned everything with the Plaintiff's name on it. (Exh. 11, Transcript of Deposition of Marianne [sic] Koper at p. 16). The earlier deposition testimony casts doubt on the Defendant's bankruptcy court trial testimony, and suggests a motive to conceal information in an effort to obstruct the Plaintiff's recovery from the Defendant. This is a permissible inference, and one the court draws after considering the demeanor of the witnesses and other evidence.

Significantly, the Defendant effected a number of extraordinary transfers after service of the state court's subpoena in September, 2006. For example, she transferred $50,000.00 in December, 2006 to her daughter, another $30,749.62 later that same month, and a number of smaller, though still significant, transfers from September 2006 to February 2007, according to bank records admitted at trial. (Exh. 13). Typical of actual fraudulent behavior, "before the

transfer was made or obligation was incurred, the [Defendant] had been sued or threatened with suit." M.C.L. § 566.34(2)(d).

The Defendant testified, disingenuously, that she bought a home for herself, using the insurance proceeds, but put title in her daughter's name rather than her own. When pressed, she said she did it this way in case something should happen to her, essentially for estate planning purposes. The court does not credit this explanation for several reasons. First, it is clear the Defendant was all too familiar with wills, as she was involved in her husband's probate proceedings and had retained counsel. Certainly, she learned a lesson about the efficacy of a last will and testament when her husband hastily made a gift *causa mortis*, evidently because he failed to provide for her in his will. She obviously knew that a will could accomplish her stated purpose, permitting her to retain use of the property during her lifetime while providing for her daughters upon her death. Moreover, if she were attempting to create a will-substitute, the court would have expected her to share title with her daughter, as joint tenants with survivorship rights, rather than placing the home solely in her daughter's name, thus making the real estate records appear as if her daughter were the only owner.

The court takes judicial notice of the Defendant's Schedules B and D, which show a relatively modest amount of property remaining with the Defendant on the petition date. From the absence of any report of significant transfers on her Statement of Financial Affairs, and from the magnitude of the insurance proceeds, it is fair to infer that she transferred substantially all of her assets while the dispute with the Plaintiff was looming -- another classic badge of fraud. Similarly, the record establishes that she made the transfers to her daughters without receiving reasonably equivalent value, and she was either insolvent or became insolvent shortly thereafter.

Because of the circumstances surrounding the Defendant's dissipation of the proceeds of the Term Policy, the existence of many of the badges of fraud courts use to infer fraudulent intent in the fraudulent conveyance setting, and the Defendant's stipulation in the state court regarding her violation of the Uniform Fraudulent Transfer Act, the court finds the Defendant actually and fraudulently intended to deprive the Plaintiff of the proceeds of the Term Policy and keep them for herself.

## IV.  CONCLUSION

Although the Defendant initially came into lawful possession of the insurance proceeds, she knew about the Plaintiff's superior claim to the funds under the JOD.  She nevertheless embarked on a spending and transfer spree marked by traditional indicia of fraudulent intent. Under the circumstances, the court has no difficulty concluding that the resulting debt should be excepted from discharge under 11 U.S.C.§ 523(a)(4).  Although it is true that the state court did not determine the parties' competing rights until its decision on the summary disposition motion on April 1, 2008, the Defendant dissipated the Plaintiff's property knowing of her competing claim.  She did so at her peril.  The bankruptcy discharge does not provide refuge for such unseemly conduct.

The evidence at trial established that the Plaintiff originally had a right to $91,251.00, but had received payments reducing the claim to $60,737.50.  The evidence also shows that the Defendant transferred well in excess of this sum after she was served with the state court's process in the probate proceeding and after she reported to her lawyer Aetna's request to preserve the funds in view of the Plaintiff's legitimate claim.  Under the circumstances, the court finds that the Plaintiff holds a claim against the Defendant in the amount of $60,737.50, and that this debt shall be excepted from discharge.

As part of her substantive claim for relief, the Plaintiff sought attorney's fees, but did not prove any amount at trial, and did not offer argument or authority for departing from the American Rule, pursuant to which each party bears its own costs. In addition, because the Plaintiff has already obtained a judgment in state court, this bankruptcy court's judgment shall be declaratory in nature only. For clarity's sake, if the Plaintiff intends to pursue collection against the Defendant, she will be enforcing the state, rather than the federal, judgment.

The court will prepare a separate judgment conforming to this opinion.

**IT IS SO ORDERED.**



Scott W. Dales
United States Bankruptcy Judge

**Dated: October 20, 2010**